**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ARKANSAS
JONESBORO DIVISION**

JOSEPH MILES and
LAWANDA LEWIS-MILES                                                PLAINTIFFS


v.                        CASE NO. 4:05-CV-1088 GTE


CENTURY 21 REAL ESTATE LLC,
CENTURY 21 REAL ESTATE UNLIMITED
LANA KRUSE, and CHRISTY WARD                               DEFENDANTS


<u>**ORDER ON MOTION FOR SUMMARY JUDGMENT**</u>

        Presently before the Court is Century 21 Real Estate LLC's Motion for Summary

Judgment.

**I.      Background**

        In the summer of 2003, Plaintiffs Joseph Miles and LeWanda Lewis-Miles, an African-

American couple serving in the United States Air Force, were transferred to Little Rock Air

Force Base.  Plaintiffs allege that in advance of their move, they took leave to travel to Little

Rock to find a home.  Plaintiffs obtained a list of housing available for rent from the Little Rock

Air Force Base, which included a home at 13 Summerset in Cabot, Arkansas.  Plaintiffs state that

they drove by the house, saw that the home and area met their needs, and noticed a sign

indicating that Century 21 was the real estate agency renting the property.  Plaintiffs state that

they called the agent listed for the home, Christy Ward, to have her show them the home.  Mr.

Miles states that he did not observe any statement about the office being independently owned or

operated on the sign, and called Ms. Ward, in part, because he believed that he would receive from any Century 21 agent quality service that was free from discrimination.

Plaintiffs allege that Ms. Ward met them at the home, did not give them a tour, and focused entirely on a white home seeker who had also arrived at the house.  Plaintiffs state that they took a tour of the home on their own, and the next day, they informed Ms. Ward that they wished to rent the home.  Ms. Ward responded that they would have to talk to the owner, Lana Kruse.  Plaintiffs state that they were informed by Ms. Kruse that they would have to pay a deposit and begin paying rent a month before they would move into the home, but when they asked questions about the rental process, Ms. Kruse stated that she was confused and needed to talk to her realtor, Ms. Ward, and hung up.  Plaintiffs state that they called Ms. Ward later that day, but she did not return their calls.  Plaintiffs state that they went to the Century 21 Cabot office to speak with Ms. Ward, and after waiting for nearly an hour, were told that the house was no longer for rent because Ms. Kruse intended to sell the house.  Plaintiffs state that the following day, the Miles' neighbor called Ms. Ward, who told her that the home was available for rent.  However, when an individual from the Little Rock Air Force Base Housing Office inquired about the home, stating that he was calling on behalf of the Miles, he was told that the house was not for rent.  Plaintiffs allege that the house was leased to white renters several weeks later.

On August 10, 2005, Plaintiffs brought this action alleging violations of federal and state anti-discrimination laws, naming Century 21 Real Estate, LLC ("Century 21") as a defendant.  In its Motion for Summary Judgment, Century 21 argues that there is no actual or apparent agency relationship between Century 21 and any of the other defendants to support Plaintiff's vicarious

liability theory.  It is undisputed that on March 28, 2003, New Visions, LLC d/b/a Century 21

Real Estate Unlimited ("Century 21 Cabot") and Century 21 entered into the Century 21 Real

Estate Franchise Agreement ("Franchise Agreement").  Plaintiffs argue that (1) the existence of

an agency relationship requires factual findings and is not appropriate for resolution by summary

judgment; (2) Century 21 is vicariously liable under an apparent agency theory; and (3) Century

21 may be found vicariously liable under an actual agency theory.

## II.  Summary Judgment Standard

Summary judgment is appropriate only when, in reviewing the evidence in the light most

favorable to the non-moving party, there is no genuine issue as to any material fact, so that the

dispute may be decided solely on legal grounds.  *Holloway v. Lockhart*, 813 F.2d 874 (8th Cir.

1987);  Fed. R. Civ. P. 56.  The Supreme Court has established guidelines to assist trial courts in

determining whether this standard has been met:

> The inquiry performed is the threshold inquiry of determining whether there is a
> need for trial-- whether, in other words, there are genuine factual issues that
> properly can be resolved only by a finder of fact because they may reasonably be
> resolved in favor of either party.

*Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 250 (1986).

The Eighth Circuit set out the burdens of the parties in connection with a summary

judgment motion in *Counts v. M.K. Ferguson Co.*, 862 F.2d 1338 (8th Cir. 1988):

> [T]he burden on the party moving for summary judgment is only to demonstrate,
> i.e., '[to] point[] out to the District Court,' that the record does not disclose a
> genuine dispute on a material fact.  It is enough for the movant to bring up the fact
> that the record does not contain such an issue and to identify that part of the
> record which bears out his assertion.  Once this is done, his burden is discharged,
> and, if the record in fact bears out the claim that no genuine dispute exists on any
> material fact, it is then the respondent's burden to set forth affirmative evidence,
> specific facts, showing that there is a genuine dispute on that issue.  If the

respondent fails to carry that burden, summary judgment should be granted.

*Id*. at 1339 (quoting *City of Mt. Pleasant v. Associated Elec. Coop.*, 838 F.2d 268, 273-74 (8th

Cir. 1988)) (citations omitted)(brackets in original).

"A party seeking summary judgment always bears the initial responsibility of informing

the district court of the basis for its motion, and identifying those portions of [the record] . . .

which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v.

Catrett*, 477 U.S. 317, 323 (1986).  However, the moving party is not required to support its

motion with affidavits or other similar materials negating the opponent's claim.  *Id*.

Once the moving party demonstrates that the record does not disclose a genuine dispute

on a material fact, the non-moving party may not rest upon the mere allegations or denials of his

pleadings, but his response, by affidavits or as otherwise provided in Rule 56, must set forth

specific facts showing that there is a genuine issue for trial. Fed. R. Civ. P. 56(e).  The plain

language of Rule 56© mandates the entry of summary judgment against a non-moving party

which, after adequate time for discovery, fails to make a showing sufficient to establish the

existence of an element essential to its case, and on which that party will bear the burden of proof

at trial.  *Celotex Corp.*, 477 U.S. at 322.

## III.  Motion for Summary Judgment

A franchisor may be held liable for acts of his franchisee when the actual relationship

between them is that of principal and agent or master and servant.  *Jones v. Filler, Inc.*, 43 F.

Supp. 2d 1052, 1055 (W.D. Ark. 1999) (citing 62B Am. Jur. 2d, *Private Franchise Contracts* §

491, at 406 (1990)).  Thus, the essential question before this Court is whether an actual or

apparent agency relationship exists between Century 21 and Century 21 Cabot.  "[A]gency is a

4

question of fact ordinarily determined by the trier of fact, [however], where the facts are

undisputed, and only one inference can reasonably be drawn from them, it becomes a question of

law." *Jones v. Filler, Inc.*, 43 F. Supp. 2d 1052, 1055-56 (W.D. Ark. 1999) (citing *Howard v.

Dallas Morning News, Inc.,* 324 Ark. 91, 103, 918 S.W.2d 178 (1996)).  Plaintiffs raise both

federal and state law claims in their Complaint, and therefore, the question of whether an agency

relationship exists is determined under federal and state law respectively.

### A.  Actual Agency

"[T]he [Fair Housing] Act imposes liability without fault upon the employer in

accordance with traditional agency principles." *Meyer v. Holley*, 537 U.S. 280, 282, 123 S. Ct.

824, 827 (2003).  "The Restatement § 1 specifies that the relevant principal/agency relationship

demands not only control (or the right to direct or control) but also "the manifestation of consent

by one person to another that the other shall act *on his behalf* (3)27, and consent by the other so

to act." (Emphasis added.).  *Id*. at 286, 123 S. Ct. at 829.  Arkansas has adopted the Restatement

definition of agency in a number of cases." *Howard v. Dallas Morning News, Inc.*, 324 Ark. 91,

99-100, 918 S.W.2d 178, 182-83 (1996) (citing cases).

"The Restatement (Second) of Agency, § 1, cmt. b (1957) provides that 'the relationship

of agency does not depend on the intent of the parties to create it, nor the belief that they have

done so. To constitute the relationship there must be an agreement, but not necessarily a contract,

between the parties; if the agreement results in the factual relationship between them to which are

attached the legal consequences of agency, an agency exists although the parties did not call it

agency and did not intend the legal consequences of the relationship to follow.'" *Id*.  "The

Restatement further provides that the 'relationship of master and servant can be created although

there is no mutual agreement to give and receive assistance. It is only necessary that there be

submission by the one giving service to the direction and control of the one receiving it as to the

manner of performance.' Restatement (Second) of Agency § 221, cmt. c (1957)." *Id*.  "On the

other hand, [Arkansas courts] have defined an independent contractor as one who, exercising an

independent employment, contracts to do work according to his own methods and without being

subject to the control of the employer, except as to the results of the work, and have held that the

right to control and not the actual control determines whether one is a servant or an independent

contractor."  *Id*. (citing *Wilson v. Davison,* 197 Ark. 99, 122 S.W.2d 539 (1938)).

"The relation of agency is created as the result of conduct by two parties manifesting that

one of them is willing for the other to act for him subject to his control, and that the other

consents to so act."  *Jones v. Filler, Inc.*, 43 F. Supp. 2d 1052, 1056 (W.D. Ark. 1999) (citing

*Columbia Mut. Cas. Ins. Co. v. Ingraham,* 47 Ark. App. 23, 34, 883 S.W.2d 868 (1994)). "The

two essential elements of an agency relationship are (1) that an agent have the authority to act for

the principal and (2) that the agent act on the principal's behalf and be subject to the principal's

control."  *Id*. (citing *McMahan,* 319 Ark. at 90, 890 S.W.2d 242).

> In deciding whether a given individual or entity is an agent or an independent
> contractor, the Arkansas courts have considered the ten factors found in § 220 of
> the Restatement (Second) of Agency: (a) the extent of control which, by
> agreement, the master may exercise over the details of the work; (b) whether or
> not the one employed is engaged in a distinct occupation or business; (c) the kind
> of occupation, with reference to whether, in the locality, the work is usually done
> under the direction of the employer or by a specialist without supervision; (d) the
> skill required in the particular occupation; (e) whether the employer or the
> workman supplies the instrumentalities, tools, and the place of work for the
> person doing the work; (f) the length of time for which the person is employed;
> (g) the method of payment, whether by the time or by the job; (h) whether or not
> the work is a part of the regular business of the employer; (i) whether or not the
> parties believe they are creating the relation of master and servant; and (j) whether

the principal is or is not in business.

*Id.* (citing *Blankenship v. Overholt,* 301 Ark. 476, 479, 786 S.W.2d 814 (1990)).  The Arkansas

Supreme Court has stated that the right of control is the principal factor to be considered in

making the determination.  *Howard*, 324 Ark. at 99-100.

"Retaining certain rights such as the right to enforce standards, the right to terminate the

agreement for failure to meet standards, the right to inspect the premises, the right to require that

franchisees undergo certain training, or the mere making of suggestions and recommendations

does not amount to sufficient control."  62B Am. Jur. 2d, *Private Franchise Contracts* § 298.

"Thus, the standardized provisions commonly included in franchise agreements specifying

uniform quality, marketing, and operational requirements and a right of inspection do not

establish a franchisor's control or right to control the daily operations of the franchisee sufficient

to give rise to vicarious liability for all purposes or as a general matter."  *Id*.  In deciding whether

the franchisor's actions give rise to a legal duty, courts typically draw distinctions between

recommendations and requirements."  *Id*.  *See also Wendy Hong Wu v. Dunkin' Donuts, Inc*., 105

F. Supp. 2d 83, 88 (E.D.N.Y. 2000) ("Most courts have found that retaining a right to enforce

standards or to terminate an agreement for failure to meet standards is not sufficient control. A

right to reenter premises and inspect also generally does not give rise to a legal duty.").

The Arkansas Supreme Court has discussed the right to control issue in the agency

context in several cases.  In *Howard v. Dallas Morning News, Inc.*, 324 Ark. 91, 94, 918 S.W.2d

178, 179 (1996), the Court reversed the trial court's grant of summary judgment and found that

there was sufficient proof of the defendant delivery company's control of the scope, details, and

manner of newspaper delivery by the driver when the defendant assigned territorial routes,

7

prohibited the insertion of other materials, required strict record keeping, required substitution of a carrier if that driver could not perform, supplied all forms and equipment (with the exception of the delivery person's truck), required the delivery person to complete complicated paperwork, monitored the driver's performance, and structured the essentially salaried pay system that paid the delivery person.  However, in *Williams v. Nucor*, 318 Ark. 452, 886 S.W.2d 586 (1994), the Court affirmed the trial court's grant of summary judgment when the contract mandated that the contractor provide all of the workers, tools, and supervision needed to perform the job, and affidavits and depositions revealed that the principal did not maintain or attempt to maintain control over the details of the contractor's work.

In *Jones v. Filler, Inc.*, 43 F. Supp. 2d 1052, 1057 (W.D. Ark. 1999), the United States District Court for the Western District of Arkansas found that no agency relationship existed when there was no evidence that the franchisor exercised control over the operations of the franchisee to a substantial degree.  There, the franchisee stated that the franchisor exercised no control over his shop and the plaintiff's only evidence to dispute the franchisee's statement were the various provisions of the franchise agreement.  *Id.*  The Court noted that the franchisor controlled, to some extent, the public image of the franchisee's shop by requiring the franchisee to "keep his shop open to the public during all normal business days and hours" and "maintain interior and exterior painting and decor in such manner and form as may be reasonably prescribed from time to time by [the franchisor]."  *Id.*  However, the court found that "under the terms of the Franchise Agreement, [the franchisee] is merely the recipient of a license granted by [franchisor] to operate a shop under the [franchisor's] name and to use [the franchisor's] Proprietary Marks in connection therewith."*Id.*  It stated that the franchisor did not "exercise

control over the operations of the franchisee to a substantial degree," as there was no evidence that the franchisor controls the manner in which the franchisee performs the daily operations of its business. *Id.* (citing 62B Am. Jur. 2d, *Private Franchise Contracts* § 492 at 408 (1990) Specifically, the court noted that the franchisor "does not control the manner in which [the franchisee] hires and fires employees; trains and supervises employees; or performs services." *Id.* The court stated the purchase of and use of the franchisor's products and system "does not, in and of itself, create an agency relationship, absent additional evidence of control." *Id.*

Similarly, in *O'Bryant v. Century 21 South Cent. States, Inc.*, 899 S.W.2d 270, 271 (Tex. App. 1995), Plaintiffs relied upon the "mandatory language of the agreement and the franchise terms which specifically provide for [the franchisor] to control [the franchisee's] use of [the franchisor's] trade name, the location, hours, and the appearance of the franchised business, as well as other provisions related to the operation of a franchised business" in arguing that an agency relationship between the franchisor and franchisee existed, which would impose vicarious liability for the alleged negligent acts of the franchisee. The Plaintiff also relied "on certain provisions of the Policy and Procedures Manual, portions of deposition testimony, and correspondence from [the plaintiff] concerning [the franchisee's] deviation from the franchise agreement as proof of [the franchisor's] right of control over the day-to-day operations of [the franchisee]." There, however, the Plaintiff presented no proof that the franchisor "had the right of control over any of the matters complained of" by the Plaintiff, specifically negligence and numerous violations of the Texas Deceptive Trade Practices Act when the franchisee leased a house to Plaintiff, who was later sexually assaulted in that house. *Id.* at 271-72. In affirming the trial court's grant of summary judgment on the agency issue, the court noted that "the deposition

9

testimony of a Century 21 executive vice-president . . . confirmed that [the franchisor] did not

have the right of control over the manner in which [the franchisee] listed, sold, or leased

residential properties, or the terms of employment of [the franchisee's] agents and employees."

*Id*.

However, in *Butler v. McDonald's Corp.*, 110 F. Supp. 2d 63, 67 (D.R.I. 2000), the court

noted that "[t]he Rhode Island Supreme Court has outlined the indicia for the right to control in

an agency relationship.  Relevant examples include a principal's beneficial interest in the agent's

undertaking, written agreements between the parties, and instructions given to the agent by the

principal relating to how to conduct business."  There, the court found that a reasonable jury

could conclude that an agency relationship existed, as the plaintiffs cited franchisor's

requirement that the franchisee conform to "comprehensive system, the frequent and detailed

inspections of the premises and its operations, the taking of profits, and the right of defendant to

terminate the agreement for material breach."  *Id.*

Defendant Century 21 argues that summary judgment is appropriate because no agency

relationship existed between Century 21 and the other defendants.  Defendant Century 21 argues

that the Franchise Agreement explicitly states:

> Franchisor [Century 21] shall not regulate the hiring or firing of Franchisee's
> salespeople, the parties from whom Franchisee may accept listings or for whom
> Franchisee may sell property, the commission rates charged by Franchisee, the
> commission splits between Franchisee and Franchisee's salespeople, the details of
> the work performed by Franchisee or its sales associates, the manner in which
> Franchisee obtains listings or sells property, the working conditions of
> Franchisee's salespeople, or Franchisee's contracts with clients or customers,
> except to the extent necessary to protect the CENTURY 21 Marks, trade names
> and goodwill associated therewith.  The conduct of Franchisee's business shall be
> determined by its own judgment and discretion, subject only to the provisions of

this Franchise Agreement and the P&P Manual as it shall be adopted or revised from time to time.[1]

Furthermore, the Franchise Agreement requires that a statement that the franchise "IS INDEPENDENTLY OWNED AND OPERATED" be "conspicuously" placed on a placard or decal on or near the door to the front entrance of Century 21 Cabot's office,[2] on all business cards, stationary, promotional and advertising materials, real estate documents, and all other materials used by Century 21 Cabot.[3]  The Century 21 Policy and Procedure Manual (P&P Manual") requires that the "appropriate disclaimer, "Each Office Is Independently Owned And Operated," must always appear . . . on all yard signs."[4]  Defendant Century 21 states that Ms. Ward receives no compensation from Century 21.  Defendant Century 21 also argues that the provisions regarding the appearance and location of Century 21 Cabot's offices, the trade name under which Century 21 Cabot operates, how many days Century 21 Cabot operates, and contributions to a national advertising fund are insufficient to show day-to-day control over the sale and rental of residential properties.

In opposition to the Motion for Summary Judgment, Plaintiffs argue that Century 21 retains a substantial degree of control over the operation of the franchisees, including Century 21 Cabot.  Plaintiffs state that the Franchise Agreement requires that Century 21 Cabot abide by the terms of the Century 21 P&P Manual, and provides that Century 21 has the right to make

---

[1]Exhibit A p. 25, Defendant's Motion.

[2]Exhibit A p. 13, Defendant's Motion.

[3]Exhibit A p. 19, Defendant's Motion.

[4]Exhibit 9, Bates No. 258, Plaintiffs' Response.

reasonable changes in the P&P Manual.[5]  The Franchise Agreement also requires that Century 21 Cabot obtain any equipment, products, or services that Century 21 deems necessary for the utilization of a product or service that is determined by Century 21 to be an "essential element of the Franchise."[6]  Century 21 may survey the service and performance of Century 21 Cabot by sending questionnaires to clients of Century 21 Cabot,[7] and if Century 21 Cabot's performance does not meet the current minimum standard of performance and quality, Century 21 Cabot may be placed on probation for a period established by Century 21.[8]  Century 21 provides extensive requirements for the use of its logo, marks, name, and symbols.[9]  If Century 21 Cabot does not meet the requirements set forth in the Franchise Agreement, or violates state or federal law, Century 21 may terminate the franchise or place the franchise on probation.[10]

Plaintiffs further argue that Century 21 Cabot pays six percent of its gross revenues to Century 21 as a royalty[11] and two percent of its gross revenues to Century 21 for the Century 21 National Advertising Fund.[12]  Century 21 Cabot must also pay a fee for any referral that comes to

---

[5]Exhibit 8 p. 20, Plaintiffs' Response in Opposition to Defendant Century 21 Real Estate LLC's Motion for Summary Judgment ("Plaintiffs' Response").

[6]Exhibit 8 p. 5, Plaintiffs' Response.

[7]Exhibit 8 p.19, Plaintiffs' Response.

[8]Exhibit A p. 22, Defendant Century 21 Real Estate LLC's Motion for Summary Judgment ("Defendant's Motion").

[9]Exhibit 9, Bates Nos. 323-85, Plaintiffs' Response.

[10] Exhibit 1 p. 27-28, Plaintiffs' Response.

[11]Exhibit 1 p. 46, Plaintiffs' Response.

[12]Exhibit 8 p. 11, Plaintiffs' Response.

it through the Century 21 Global Referral Network.[13]   Century 21 requires that its franchisees,

including Century 21 Cabot remain open six days a week.  Also, at any reasonable time, Century

21 may perform onsite inspections of Century 21 Cabot's premises and financial audits,[14] and

require Century 21 Cabot to make alterations or upgrades to its office[15] and computer

equipment.[16]  Century 21 Cabot is required to indemnify Century 21 and maintain liability

insurance, if Century 21 deems it necessary.[17]  Century 21 makes the Century 21 "system"

available to Century 21 Cabot,  including products, services, training, tools, and form

documents.[18]  The agreement between Century 21 Cabot and its agents may have been a Century

21 National Form document, and is very similar to the P&P Manual that governs the relationship

between Century 21 and Century 21 Cabot.[19]  Century 21 Cabot also receives referrals from

Century 21 through the Century 21 Global Referral Network.[20]

Additionally, Century 21's Regional Service Directors regularly contact Century 21

Cabot regarding market/office trends, renewal status, the Century 21 mortgage program, the

Century 21 home protection policy program, Century 21 Cabot's commissions and fees, Century

---

[13]Exhibit 9, Bates No. 229, Plaintiffs' Response.

[14]Exhibit 8 p. 19, Plaintiffs' Response.

[15]Exhibit 9 p. 13, Plaintiffs' Response.

[16]Exhibit 9, Bates No. 218, Plaintiffs' Response.

[17]Exhibit 8 p. 14, Plaintiffs' Response; Exhibit 1 p. 86, Plaintiffs' Response.

[18]Exhibit 1 p. 61-62, Plaintiffs' Response; Exhibit 5 p. 77-78, Plaintiffs' Response.

[19]Exhibit 5 p. 32, Plaintiffs' Response.

[20]Exhibit 9, Bates No. 225-29, Plaintiffs' Response.

21's profit study of Century 21 Cabot, and the Century 21 National Awards program.[21]   Century 21 participates in discussions regarding the possible merger of franchises in central Arkansas.[22] Changes in the designated responsible broker, franchise name, outdoor signage, ownership, and location by Century 21 Cabot require approval by Century 21.[23]  Also, temporary closings or operation of another business by a franchise adjacent to the real estate office must be approved by Century 21.  Century 21 Cabot is required to report (1) all real estate transactions; (2) information on all listings; (3) information related to referral transactions; (4) information related to any change in the office; (5) information related to any complaints or litigation information; (6) any change of broker; (7) all sales associates rosters; and (8) information regarding members of the office staff.[24]

Specifically regarding fair housing and discrimination, the Century 21 P&P Manual states, "Complaints involving discrimination . . . will be forwarded to Franchisor's Legal Department and the President's office for immediate review."[25]  Also, CREATE 21, a training tool provided by Century 21 that Century 21 Cabot requires its agents to complete before they begin working there, provides training on a vast array of subjects, including fair housing, according to the owner of Century 21 Cabot.[26]  However, Century 21 states that the only

---

[21]Exhibit 11, Bates No. 344, Plaintiffs' Response.

[22]Exhibit 11, Bates Nos. 335-347, Plaintiffs' Response.

[23]Exhibit 8 p. 15, Plaintiffs' Response; Exhibit 9, Bates Nos 220-21, Plaintiffs' Response.

[24]Exhibit 9, Bates Nos. 219, 286, Plaintiffs' Response.

[25]Exhibit 9, Bates No. 221, Plaintiffs' Response.

[26]Exhibit 5 p. 41, Plaintiffs' Response

mandatory training it requires of its franchisees is the International Management Academy for the broker of the franchise.[27]   Century 21 also claims that none of the training systems it offers cover issues related to fair housing because of the broad scope that training would have to include, *i.e.* not only federal regulations, but also any applicable state, county and city regulations.[28] Additional training tools tailored to increasing levels of experience are made available by Century 21 to its franchisees, including Blast and a series of self-paced internet based programs.[29]

Based upon the evidence offered by Plaintiffs of Defendant Century 21's right to control Century 21 Cabot, the Court finds that no reasonable jury could conclude that an actual agency relationship exists. Century 21's retention of its right to inspect, to receive reports regarding the performance of Century 21 Cabot and possible legal issues faced by the franchisee, and to enforce its standards through probation and termination does not amount to sufficient control. Century 21 did not have the right of control over the manner in which Century 21 Cabot listed, sold, or leased residential properties, or the terms of employment of Century 21 Cabot's agents and employees.  While Century 21 Cabot requires the use of certain training programs by its agents, Century 21 only requires the broker of the franchise to attend the International Management Academy.   Therefore, summary judgment is granted as to the issue of actual agency.

---

[27]Exhibit 1 p. 57, Plaintiffs' Response.

[28]Exhibit 1 p. 58, Plaintiffs' Response.

[29]Exhibit 1 p. 57, Plaintiffs' Response.

### B.  Apparent Agency

"Generally, to recover under a theory of apparent agency, a plaintiff must show that: (1) the apparent principal represented or held out the apparent agent; and (2) justifiable reliance upon the representation led to the injury."  62B Am. Jur. 2d, *Private Franchise Contracts* § 300.  "To apply the doctrine of apparent agency to a franchisor/franchisee situation, the plaintiff must prove: (1) that the franchisor acted in a manner that would lead a reasonable person to conclude that the operator and/or employees of the franchise were employees or agents of the defendant; (2) that the plaintiff actually believed the operator and/or employees of the franchise were agents or servants of the franchisor; and (3) that the plaintiff thereby relied to his or her detriment upon the care and skill of the allegedly negligent operator and/or employees of the franchise."  *Id.* "Examples of a franchisor's behavior that could lead a reasonable person to believe that a franchisee is an agent of the franchisor include all means and methods that would maintain an image of uniformity among all of the franchises, including national advertising, common signs and uniforms, common menus, common appearance, and common standards."  *Id.*

In *Pona v. Cecil Whittaker's, Inc.*, 155 F.3d 1034, 1036 (8th Cir. 1998), the Eighth Circuit found no apparent authority existed because the question of the franchisor's "liability under Title III of the ADA depends on its actual connection to the premises, not on [the customer's] belief about that relationship."  Specifically, the court found that "[n]othing in the record . . . would indicate that [the franchisor] did anything to give customers the impression that it controlled access to the building" and the customer could not show "that she relied on any such impression."  *Id.*  The court further stated that "the mere fact that a franchisor's sign appears on a building and the employees within that building wear uniforms bearing the franchisor's logo and

insignia does not clothe a franchisee with the apparent power to act on the franchisor's behalf in anything approaching a general way." *Id*. *See also Wilson v. United States*, 989 F.2d 953, 959 (8th Cir. 1993) (finding that no apparent agency existed when the plaintiffs failed to produce any evidence that the alleged principal manifested that it had direct control over the specific activities of the alleged agents or that it had a duty to control, supervise or train volunteer leaders of the alleged agents).

Similarly, in *Dalia v. Electronic Realty Associates, Inc*., 629 So. 2d 1075, 1076 (Fla. Dist. Ct. App. 1994), the court upheld the trial court's grant of summary judgment because there were no facts on which to conclude that the franchisee real estate agency was the apparent agent of the franchisor real estate company. The court noted that the plaintiff's deposition negated the reliance element, and that the franchise arrangement required the franchisee to hold itself out as "an independently owned and operated business." *Id*. There, the franchisor was ERA, while the franchisee operated as Northgate Realty, Inc. *Id*. The court distinguished *Orlando Executive Park, Inc. v. Robbins,* 433 So.2d 491, 493-94 (Fla. 1983), in which the franchise relationship was one which authorized the franchisee to do business as Howard Johnson Motor Lodge, and the "use of a single corporate name throughout the motel chain, along with the other factors . . . created the public perception that the Howard Johnson lodges were under common ownership and control, or at least the trier of fact could reasonably so conclude." *Id*.

Also, in *Allen v. Greenville Hotel Partners, Inc.*, 409 F. Supp. 2d 672, 681 (D.S.C. 2006), the district court found that the franchisor's national advertisements and the franchisee's use of the name and trade mark of the franchisor, when coupled with notices in at least two locations in the building that the franchisor did not run and operate the hotel, "did not constitute a

'representation' for purposes of establishing apparent agency.  (citing *Anderson,* 483 S.E.2d at

601 (finding that Choice could not be liable under an apparent agency theory because there was

no evidence "that the franchisee, with the knowledge of the franchisor, held itself out as being

operated by the franchisor."); *BP Exploration & Oil, Inc. v. Jones,* 252 Ga. App. 824, 558 S.E.2d

398, 403 (2001) ("[A] national oil company's advertising campaign to solicit the public's trust

and confidence in its affiliates does not necessarily render the oil company liable for injuries at

an independently operated gasoline station." (internal quotation marks omitted)); *McGuire v.*

*Radisson Hotels Int'l, Inc.,* 209 Ga. App. 740, 435 S.E.2d 51, 53-54 (1993) (finding that the

franchisee's display of the Radisson name at the hotel, coupled with Radisson advertisements, did

not constitute a representation)).  *See also Brooks v. Collis Foods, Inc.*, 365 F. Supp. 2d 1342,

1351 (N.D. Ga. 2005) (finding that the plaintiff's belief that they were entering a restaurant

owned and operated by the franchisor was a result of the actions of the franchisee bearing the

logo and signage of the franchisor, and therefore, the franchisee was holding itself out as the

franchisor, rather than the reverse); *Coldwell Banker Real Estate Corp. v. DeGraft-Hanson*, 266

Ga. App. 23, 26, 596 S.E.2d 408, 410-11 (Ga. App. 2004) (finding no apparent agency when the

plaintiffs had no contact with the franchisor and plaintiffs only alleged that the documents of the

franchisee, rather than the franchisor, failed to clearly state the franchisee's independent status).

In contrast, in *McDonald v. Century 21 Real Estate Corp.*, 111 Wis. 2d 600, 604-06, 331

N.W.2d 606, 608-09 (Wis. Ct. App. 1983), the court reversed the trial court's grant of summary

judgment and determination that the plaintiffs "failed to exercise reasonable care in his belief that

Blackmon Realty was authorized to act as agent for Century 21 and Mid West."  The court found

that the facts of the case were paramount stating:

18

[T]he commercials [plaintiff] saw said that Century 21 was the largest real estate company in the United States, it had a nationwide referral system, it had nationwide resources available due to its size, it utilized "neighborhood professionals" and showed a Century 21 sign and emblem and employees wearing yellow blazers. Blackmon Realty displayed the Century 21 logo at its office and on signs and forms; each employee wears a gold blazer with a Century 21 logo on it; Blackmon employees received training and sales materials from Mid West; and Blackmon Realty benefits from nationwide advertising which identifies Century 21 franchises and "neighborhood professionals" who are part of the nationwide organization. Blackmon Realty was advertised as a business containing a "neighborhood professional" belonging to a nationwide "organization that more people have put their trust in." Blackmon Realty employees were pictured in local ads which were drafted by Century 21 or Mid West. Blackmon Realty's employees may have conveyed the impression that it represented the Century 21 and Mid West organizations. Signs and printed materials contain the statement: "Each office is independently owned and operated." The "Century 21 Real Estate Action Warranty" which McDonald signed when listing the properties states in three places that the broker is an independent operator.

McDonald's affidavit states that he assumed the statement "each office is independently owned and operated" meant that each office was responsible for a particular geographic area. In addition, he thought that he would be dealing with a "neighborhood professional" at the local level who was acting on behalf of the nationwide real estate company advertised on television and in newspapers.

*Id*. The court stated, "When, as here, the ultimate issue-the reasonableness of [the plaintiff's] reliance-turns on the totality of the facts and circumstances, the parties must be given a full opportunity to develop the necessary evidentiary record. *Id*.

Similarly, in *Burkland v. Electronic Realty Associates, Inc*., 228 Mont. 113, 116-17, 740 P.2d 1142, 1145 (Mont. 1987), the Montana Supreme Court reversed the trial court's grant of summary judgment after carefully reviewing the facts of the case:

[T]he affidavits of the plaintiffs establish that they did not read any disclaimer by ERA, Inc., they relied on the national TV advertising they had seen of ERA, the reputation of ERA, Inc., and they believed they were dealing with ERA, Inc., at the time of purchasing the home. The affidavit of ERA, Inc., established without contradiction that ERA, Inc., had no control over the selling real estate agent, that it did not share in the profits of that agent, and that it was not a licensed real estate

19

agent in Montana and actually had nothing to do with the sale to the plaintiffs.
The listing of the home in question contained the "independently owned and
operated" disclaimer.

*Id.*  The court concluded that these facts constitute a genuine issue of material fact that should be

determined by a trier of fact, specifically that a "key material fact is whether the disclaimer was

sufficient to make the plaintiffs' reliance on ERA, Inc., unreasonable."  *Id.*

The United States District Court for the District of Columbia distinguished cases

involving corporations who sell their products through authorized dealers from cases in which a

real estate firm arranged to have its tradename used by real estate professionals, and in which the

firm then claims that the professional was not its apparent agent.  *Ago v. Begg, Inc.*, 705 F. Supp.

613, 618-620 (D.D.C. 1988) (holding that the real estate agent was an apparent agent of the real

estate company).  The court stated:

Here, the licensee does not simply sell a good manufactured by or distribute a
credit card authorized by the licensor. The licensee "sells" her expertise, advice,
and fiduciary capability. A customer reasonably depends on the name, goodwill,
and reputation of the real estate firm whose tradename is used by the licensee; he
puts his trust in the licensee to advise him on a potentially long-term financial
arrangement. It would strain credulity to consider that the purpose of the licensing
agreement was other than to enable Mount Vernon Realty, one of the largest real
estate firms in the Washington area, and Noah-Cummings, the employer of Ms.
Jacobsen, to convince the public that the expertise, reputation, credibility, and
*dependability* of Mount Vernon Realty were behind Noah-Cummings' employees,
to the financial benefit of both firms. Indeed, the president of Mount Vernon
Realty testified to this effect at trial. As plaintiffs have pointed out, Noah-
Cummings' employees received business cards and stationery with the name of
Mount Vernon Realty printed on them and Mount Vernon Realty's advertisements
in the phone yellow pages listed Noah-Cummings as an affiliate.

Unlike a car manufacturer or an oil company, a real estate firm should and must
expect the client who deals with his licensee/professional to believe that this real
estate professional with whom he deals, licensee or not, is backed, financially and
otherwise, by the firm to which she has presented herself as being associated.

20

> Thus, the firm must expect the client to believe that the real estate professional
> who uses the tradename of the firm is the firm's agent.

*Id.*

In support of their assertion that the doctrine of apparent agency applies in this case, Plaintiffs submit the deposition testimony of Mr. Thomas Kunz, the President and Chief Executive Officer of Century 21 Real Estate LLC, where he states that Century 21 is the "most recognized real estate sign in the world,"[30] and the logo, as a brand, "conveys . . . some kind of minimum expectation that we would – that a consumer would expect to received from anybody that would have that brand."[31]  Plaintiffs also argue that Ms. Shown, the owner of Century 21 Cabot, states that when she purchased Century 21 Cabot, she received "[g]oodwill.  I got a nationally recognized company name."[32]  Plaintiffs state that the Century 21 logo, marks, name, and symbols are used extensively by Century 21 Cabot, and Century 21 provides precise specifications for the use of its proprietary marks.[33]  Century 21 Cabot also pays two percent of its gross revenues to Century 21 for the Century 21 National Advertising Fund.[34]  The Franchise Agreement requires that Century 21 Cabot abide by the terms of the Century 21 P&P Manual[35] and that Century 21 Cabot obtain any equipment, products, or services that Century 21 deems

---

[30]Exhibit 1 p. 92, Plaintiffs' Response.

[31]Exhibit 1 p. 63, Plaintiffs' Response.

[32]Exhibit 5 p. 53, Plaintiffs' Response.

[33]Exhibit 9, Bates Nos. 323-85, Plaintiffs' Response.

[34]Exhibit 8 p. 11, Plaintiffs' Response.

[35]Exhibit 8 p. 20, Plaintiffs' Response in Opposition to Defendant Century 21 Real Estate LLC's Motion for Summary Judgment ("Plaintiffs' Response").

necessary for the utilization of a product or service that is determined by Century 21 to be an

"essential element of the Franchise."[36]

Plaintiffs also rely on the affidavit of Plaintiff Joseph Miles, which states:

My wife and I drove by the home at 13 Summerset and observed that the home was being represented by a Century 21 agent.  The Century 21 name has a very good reputation and from my understanding is known for its quality, well-trained agents.  I believed that in using a Century 21 agent, I would receive professional, courteous service that would certainly be free from discrimination.  I called the Century 21 agent, Christy Ward, listed on the sign in front of the home at 13 Summerset in part because I believed I would receive quality service from any Century 21 agent.  When [] Christy Ward did not provide the service I expected from a Century 21 agent, I visited the Century 21 office in Cabot, Arkansas to pursue renting the home because I believed that the office as a part of the Century 21 family would ensure that I was treated respectfully and fairly in my attempts to rent the 13 Summerset home listed by the Century 21 office.  Absent the indication that the home was represented by a company with a reputation like Century 21, I would not have expended the additional effort of visiting the real estate office to make further attempts to rent the home after receiving the treatment I did from Ms. Ward and may not have pursued renting the home.[37]

Plaintiff Joseph Miles also states that he did not observe the disclaimer that each office is

"independently owned and operated" on the sign in front of the house, Ms. Ward's business card,

or in the Century 21 Cabot office, but even if he had observed such a statement, he does not

understand the legal consequences of such a statement.[38]

While noting that this is a very close question, the Court finds the opinion in *Ago*, and

cases reaching similar conclusions, persuasive.  The Court finds that a reasonable jury could

conclude that Century 21 represented or held out Century 21 Cabot and that the Miles' justifiably

---

[36]Exhibit 8 p. 5, Plaintiffs' Response.

[37]Exhibit 7 p.1-2, Plaintiffs' Response.

[38]Exhibit 7 p. 1-2, Plaintiffs' Response.

relied upon the representation, which led to their injury.  More specifically, a reasonable jury could conclude that Century 21 acted in a manner that would lead a reasonable person to conclude that Century 21 Cabot and Ms. Ward were agents of Century 21; (2) that the plaintiffs actually believed that Century 21 Cabot and Ms. Ward were agents or servants of Century 21; and (3) that the plaintiffs thereby relied to their detriment upon the care and skill of Century 21 Cabot and Ms. Ward.  Therefore, summary judgment is denied as to the issue of apparent agency.

Accordingly,

FOR THE REASONS STATED ABOVE, IT IS HEREBY ORDERED THAT Defendant Century 21 Real Estate LLC's Motion for Summary Judgment (Docket #45) be, and is hereby, GRANTED in part and DENIED in part.

IT IS SO ORDERED THIS 11th day of January, 2007.


/s/Garnett Thomas Eisele_____
UNITED STATES DISTRICT JUDGE